**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Brenda TUCKER and Barbara
McDonald, Defendants–
Appellees.**

No. 93–6028.

United States Court of Appeals,
Sixth Circuit.

Argued March 17, 1994.

Decided July 15, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 26, 1994.

Devon L. Gosnell, Asst. U.S. Atty. (argued), Vivian R. Donelson, Asst. U.S. Atty. (briefed), Memphis, TN, for U.S.

William D. Massey, Memphis, TN (briefed), for Brenda Tucker.

Robert C. Brooks, Office of Federal Public Defender, W.D.Tenn., Memphis, TN (argued and briefed), for Barbara McDonald.

Before: MARTIN, SUHRHEINRICH, and SILER, Circuit Judges.

SUHRHEINRICH, Circuit Judge, delivered the opinion of the court, in which

---

SILER, Circuit Judge, joined. MARTIN, Circuit Judge (pp. 1429–30), delivered a separate opinion concurring in the result.

SUHRHEINRICH, Circuit Judge.

 Defendants were indicted for purchasing, and aiding and abetting the purchase of, food stamps in violation of 7 U.S.C. § 2024(b)(1). Defendants moved to dismiss the indictment, claiming that the government's conduct in inducing defendants to commit their crimes was so "outrageous" that it violated their due process rights. The district court referred the matter to a magistrate judge for evidentiary hearings, findings and recommendations. The magistrate's report recommended dismissal, the district court accepted this recommendation and the government, pursuant to 18 U.S.C. § 3731, appeals. Because we find no binding authority requiring or even authorizing this court to conduct a purely objective assessment of the government's conduct in this case, we decline to do so. Defendants' assertion of a "due process" defense based upon such an assessment is, in our view, nothing more than a claim of entrapment and, accordingly, we **REVERSE** and **REMAND** for trial.

## I. Facts

Defendants' indictment arose out of a "reverse sting," *i.e.*, an operation in which "the police pose as sellers of [contraband], set up deals with would-be buyers under carefully controlled conditions, and arrest the purchasers following the sham sale." *Owen v. Wainwright*, 806 F.2d 1519, 1520 (11th Cir.1986), *cert. denied*, 481 U.S. 1071, 107 S.Ct. 2466, 95 L.Ed.2d 875 (1987). The operative in this case, Linda Hancock, was hired by the United States Department of Agriculture to help "catch ... a lot of people that had been abusing the [food stamp] system." Hancock worked on a "commission" of sorts, keeping half the money collected from her sale of food stamps. She was not told whom she should approach, just that she should find

people willing to buy the stamps below face value and secretly record the transactions.

In November of 1990, Hancock called defendant Tucker, a friend of more than ten years. Claiming that she was in dire financial need, Hancock told Tucker that she was going to have to sell her family's food stamps in order to provide a "proper Christmas" for her children. After first resisting, Tucker finally purchased the stamps when Hancock later appeared at her beauty salon dressed in a manner suggesting her financial distress. When Hancock asked who else Tucker thought might buy some stamps, Tucker sent Hancock to McDonald, one of Tucker's employees. McDonald also purchased food stamps from Hancock after listening to her tales of ill-health and financial need.

In accepting the magistrate judge's Report and Recommendation, the district court stated:

> I don't think we are at a point in our criminal history where the government needs to lower itself into targeting sympathetic ploys on citizens that are not otherwise suspected of engaging in criminal conduct ... [Food stamp trafficking] is not such a terrible offense that the government, in my view, should be permitted to use agents under the totality of the facts of this case ... [C]ertainly there is no reason why the government cannot use undercover agents, cannot pay those undercover agents, cannot have undercover agents deal with friends, cannot use untrue ploys. All of those things individually are certainly useful techniques for investigation. But when they are employed in totality with people who are not otherwise suspected of engaging in crime, it seems to me that the conduct, as the Magistrate concluded, crosses [the constitutional] boundary.

(J.A. at 169–72).

We review the district court's dismissal *de novo*.[1] *See United States v. Leja*, 563 F.2d

---

1. Several of the magistrate judge's findings of fact relating to the amount of deception employed by the undercover operative in this case were hotly disputed. The magistrate judge resolved these disputes in favor of the defendants on the basis of the credibility of the witnesses. While the legal sufficiency of the defendants'

defense is reviewed *de novo*, the factual findings must be accepted unless found to be clearly erroneous. *See United States v. Hart*, 963 F.2d 1278, 1284 (9th Cir.1992). Here, there is no basis to reject the magistrate judge's findings. *See United States v. Taylor*, 956 F.2d 572, 576 (6th Cir.) (en banc) (lower court's factual find-

244, 245–46 (6th Cir.1977), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978).

## II. The "Due Process" Defense

Defendants argue that this court may, indeed must, undertake an independent, objective assessment of the government's methods in this case and, if we find them to be "outrageous," affirm the district court's decision to dismiss. Before engaging in the highly suspect process of labeling the conduct of a co-equal branch of our government as either "outrageous" or "not outrageous," we are compelled to determine precisely upon what authority we would do so.

### A. Entrapment

Any analysis of the so-called "due process" defense must, in our view, begin with the law of entrapment. The Supreme Court first recognized an entrapment defense in *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). In doing so, the Court resolved a deep split of authority as to whether the focus of the defense was "objective" (looking to the government's conduct), or "subjective" (looking to the defendant's predisposition). The Court, siding squarely with the *subjective* theory, held that a "defendant [who] seeks acquittal by reason of entrapment . . . cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." *Id.* at 451, 53 S.Ct. at 216.

The Court rejected an invitation to revitalize an "objective" entrapment defense in *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), holding that entrapment was the "line . . . between the trap for the unwary *innocent* and the trap for the unwary *criminal." Id.* at 372, 78 S.Ct. at 821 (emphasis added). Again, in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Court

rejected the "objective" approach to entrapment, stating:

> [*Sorrells* and *Sherman* ] establish that entrapment is a relatively limited defense. It is rooted, not in any authority of the Judicial Branch to dismiss prosecutions for what it feels to have been 'overzealous law enforcement,' but instead in the notion that *Congress* could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense but was induced to commit them by the Government.

*Id.* at 435, 93 S.Ct. at 1644 (emphasis added).[2]

To this point, therefore, it was absolutely clear that a defendant, whose predisposition to commit a particular crime was proved beyond a reasonable doubt, could not defend against prosecution on the basis that the government induced him to commit that crime, no matter how strong the inducement or "outrageous" the government's conduct.

### B. "Outrageous Conduct"

In *Russell,* the defendant argued that the defense of entrapment should be founded on constitutional principles rather than congressional intent. He argued that the government's involvement in creating his crime, *i.e.,* the means and degree of inducement, was so great "that a criminal prosecution for the [crime] violates the fundamental principles of due process," his predisposition to commit the crime notwithstanding. *Russell,* 411 U.S. at 430, 93 S.Ct. at 1642. The defendant argued that, just as with the exclusionary rule created in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), dismissal was an appropriate means of deterring future police misconduct.

The Court soundly rejected this argument, stating that "the defense of entrapment . . .

---

ings, if expressly based upon credibility evaluations, are beyond appellate review), *cert. denied,* —— U.S. ——, 113 S.Ct. 404, 121 L.Ed.2d 330 (1992).

**2.** The dissenters in· *Russell* (Justices Stewart, Brennan, Marshall and Douglas) joined the dis-

senters in *Sherman* (Justices Frankfurter, Douglas, Harlan and Brennan) and the concurring Justices in *Sorrells* (Justices Roberts, Brandeis and Stone) in support of the ill-fated "objective" defense.

was not intended to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve." *Russell*, 411 U.S. at 435, 93 S.Ct. at 1644. Rather, the "execution of the federal laws under our Constitution is confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations." *Id.* Because the defense of entrapment lacks a constitutional foundation, the Court rejected the defendant's analogy to *Weeks* and *Mapp* on the ground that, unlike the Fourth Amendment violations in those cases, "the Government's conduct here violated no independent constitutional right of the respondent." *Id.* at 430, 93 S.Ct. at 1642.

The Court, however, went on to note the following:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, *cf. Rochin v. California*, 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183] (1952), the instant case is distinctly not of that breed.... The law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment.

*Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1643.

Since this dicta was uttered, *Russell* has been cited more than two hundred times as authority for a defense based solely on an *objective* assessment of the government's conduct. Thus, the Court's dicta in *Russell* spawned the very defense which a majority of Justices in that case sought to foreclose.

Recognizing the internal inconsistency of *Russell*, then-Justice (now Chief Justice) Rehnquist, who had penned the decision in *Russell*, soon sought to recant its "maybe someday" dicta. In *Hampton v. United*

*States*, 425 U.S. 484, 489, 96 S.Ct. 1646, 1649–50, 48 L.Ed.2d 113 (1976) (plurality opinion), Justice Rehnquist rejected the defendant's *Russell*-inspired, "due process" defense on the ground that permitting such an objective assessment of the government's conduct, while ignoring the defendant's predisposition, "would run directly contrary to our statement in *Russell* ...." Justice Rehnquist elaborated:

> The limitations of the Due Process Clause of the Fifth Amendment come into play *only when the Government activity in question violates some protected right* of the Defendant.... If the result of the governmental activity is to "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission....," *Sorrells, supra* 287 U.S. at 442 [53 S.Ct. at 212–13], the defendant is protected by the defense of entrapment. If the police engage in illegal activity *in concert* with a defendant beyond the scope of their duties the remedy lies, *not in freeing the equally culpable defendant,* but in prosecuting the police under the applicable provisions of state or federal law.

*Id.* at 490, 96 S.Ct. at 1650 (emphasis added). Thus, "[t]he remedy of the criminal defendant with respect of the acts of Government agents," Justice Rehnquist concluded, "lies *solely* in the defense of entrapment." *Id.* at 490, 96 S.Ct. at 1650 (emphasis added).

Justice Rehnquist's recantation of his *Russell* dicta, however, failed to gain a majority in *Hampton.* Justices Blackmun and Powell, who joined Justice Rehnquist in *Russell,* wrote separately to say that, although the facts of *Russell* and *Hampton* did not warrant dismissal under due process, they were "unwilling to conclude that an analysis other than one limited to predisposition would never be appropriate under due process principles." *Hampton,* 425 U.S. at 493, 96 S.Ct. at 1651–52 (Powell, J., concurring in the judgment).[3]

---

**3.** Justice Powell did concede, however, that the Court, "in an appropriate case," "ultimately might reach" Justice Rehnquist's conclusion that there is "no [constitutional] source for a doctrine limiting police involvement in crime." *Hamp-*

*ton,* 425 U.S. at 494 n. 5, 96 S.Ct. at 1652 n. 5. Justice Powell, writing for a majority of the Court in *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980) (discussed *infra*), seemed to abandon the position he had

Justices Brennan, Stewart and Marshall, steadfastly adhering to the "objective" theory of entrapment which had failed to become law in *Sorrells, Sherman* and *Russell*, dissented from Justice Rehnquist's plurality opinion in *Hampton*, in part, to state that courts should be able to dismiss indictments "where the conduct of law enforcement authorities is sufficiently offensive, even though the individuals entitled to invoke such a defense might be predisposed." *Hampton*, 425 U.S. at 497, 96 S.Ct. at 1654 (Brennan, J., dissenting).

Thus, in *Hampton*, five Justices, two in dicta and three in dissent, left open the "objective" defense door which Justice Rehnquist had unlocked in *Russell*. We note, however, that just as Justice Rehnquist's comments in *Russell* were dicta, so too were his comments (and those of Justices Powell and Blackmun) in *Hampton*.

### C. Sixth Circuit Authority

This court first addressed a "due process" defense claim in *United States v. Leja*, 563 F.2d 244 (6th Cir.1977), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978). After reviewing the various opinions in *Hampton*, the court "conceive[d] the issue to be whether the governmental activity ... so offends our concepts of fundamental fairness as to justify the extraordinary employment of judicial power to curb it." *Id.* at 246. The court then rejected the defendant's "due process" defense, reasoning that if the *absence* of predisposition is merely a statutory and not a constitutional defense, "it is difficult indeed to prohibit on constitutional grounds the prosecution of the defendants ... [who] were clearly predisposed to commit the acts." *Id.* at 247. The court also declined to employ its "supervisory powers" to dismiss the indictment, holding that to do so in the absence of a constitutional violation would amount to

nothing more than the "chancellor's foot" veto against which the Supreme Court had warned in *Russell*. *Id. (quoting Russell*, 411 U.S. at 435, 93 S.Ct. at 1644).

Thus, in *Leja*, this court rejected the "due process" defense on very broad grounds and further held that, in the absence of a constitutional violation, the courts had no authority to bar a defendant's prosecution as a means of deterring law enforcement misconduct. The panel, however, refused to acknowledge the *per se* rule to which its analysis seemed to lead. Instead, in language reminiscent of Justice Rehnquist's dicta in *Russell*, the *Leja* panel went on to observe:

> Like Judge Friendly in *United States v. Archer*, [486 F.2d 670 (2d Cir.1973)], and like Justice Powell in *Hampton*,[4] we determine *never to say "never"* as long as the potential for abuse of individual rights exists in governmental action.

*Leja*, 563 F.2d at 247 (emphasis added).

In more than two dozen cases since *Leja*, this circuit has rejected "on the facts" every attempt to invoke the so-called "due process" defense. *See, e.g., United States v. Barger*, 931 F.2d 359, 363–64 (6th Cir.1991); *United States v. Qaoud*, 777 F.2d 1105, 1110–11 (6th Cir.1985), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 899 (1986); *United States v. Norton*, 700 F.2d 1072, 1076 (6th Cir.), *cert. denied*, 461 U.S. 910, 103 S.Ct. 1885, 76 L.Ed.2d 814 (1983); *United States v. Brown*, 635 F.2d 1207, 1213 (6th Cir.1980). In our view, therefore, there is no authority in this circuit which *holds* that the government's conduct in inducing the commission of a crime, if "outrageous" enough, can bar prosecution of an otherwise predisposed defendant under the Due Process Clause of the Fifth Amendment. *Leja* and the cases just cited do nothing more than "assume" the existence of such a defense while "holding"

---

taken in *Hampton* when he held that sanctions are justified under the Due Process Clause only where the governmental misconduct "violates some protected right of the defendant." *Id.* at 737 n. 9, 100 S.Ct. at 2447 n. 9 *(quoting Hampton*, 425 U.S. at 490, 96 S.Ct. at 1650 (plurality opinion) (Rehnquist, J.)).

**4.** The *Leja* panel's reliance upon Justice Powell's dicta in *Hampton* proved unfounded when Jus-

tice Powell abandoned that position in *United States v. Payner*, 447 U.S. 727, 737 n. 9, 100 S.Ct. 2439, 2447 n. 9, 65 L.Ed.2d 468 (1980). *See, supra* at note 3. In addition, at least one court has noted that *Payner* called into question the continued validity of *Archer*, upon which the *Leja* panel also relied. *See United States v. Santana*, 6 F.3d 1, 9 (1st Cir.1993).

that it would not apply under the present facts. Because "one panel of this court is not bound by dicta in a previously published panel opinion," *United States v. Burroughs,* 5 F.3d 192, 194 (6th Cir.1993), we hold that the legal existence of defendants' asserted "due process" defense is an open question in this circuit which we are free to address in the first instance.

### D. Other Circuits' Authority

Having concluded that there is no binding authority recognizing defendants' asserted "due process" defense, we look to our sister circuits for persuasive authority. To date, however, only one appellate court has employed *Russell* to bar a prosecution.[5] In *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978), a government agent suggested to the defendant that they set up a drug manufacturing operation, located a site for the plant, supplied the materials and the know-how as well as the funds to "go into business." *Id.* at 380–81. The court reversed the defendant's convictions for manufacturing the drugs, stating that "[f]undamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred." *Id.* at 381.

We note, however, that this holding has been disavowed by the Third Circuit on the ground that the *Twigg* court improperly relied on *United States v. West,* 511 F.2d 1083

(3d Cir.1975), which had been limited by *Hampton* and other, more recent, Third Circuit opinions. *See United States v. Beverly,* 723 F.2d 11, 12 (3d Cir.1983) (*citing United States v. Jannotti,* 673 F.2d 578, 610 n. 17 (3d Cir.1982) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982)). Accordingly, we do not consider *Twigg* persuasive on the issue of whether or not a "due process" defense should be recognized.

The other courts of appeals have, like our own circuit, doggedly applied the *Russell* dicta; analyzing and rejecting numerous fact patterns in search of governmental "over-reaching" which "shocks the conscience" or violates "fundamental fairness."[6] In recent years, this defense increasingly has been subjected to ridicule, *see United States v. Santana,* 6 F.3d 1, 3–4 (1st Cir.1993) (defense is the "deathbed child of objective entrapment, a doctrine long since discarded in the federal courts"), and at least one circuit judge has expressly advocated that it be abandoned. *See United States v. Miller,* 891 F.2d 1265, 1272–73 (7th Cir.1989) (Easterbrook, J., concurring).[7]

The lack of any sound doctrinal basis for a "due process" defense has, in our view, led to unnecessary conflict in the courts of appeals where, although the courts are all-but-unanimous in their results, contradictory standards have evolved. *Compare, e.g., United States v. Chin,* 934 F.2d 393, 398 (2d Cir.

---

**5.** Two other courts have come close. *See United States v. Bogart,* 783 F.2d 1428, 1438 (9th Cir.) (remanding for factfinding regarding the government's conduct), *vacated in part on other grounds sub nom. United States v. Wingender,* 790 F.2d 802 (9th Cir.1986); *United States v. Lard,* 734 F.2d 1290, 1296 (8th Cir.1984) (stating, as an alternative ground for reversing conviction, that government conduct "approached" being sufficiently outrageous to sustain due process defense).

**6.** The courts of appeals have not been completely docile regarding the so-called "due process" defense, however. There have been two efforts to restrict the defense, though neither has been consistently applied within its own circuit and neither has been expressly adopted by any court outside its own circuit. *See United States v. Kelly,* 707 F.2d 1460, 1476 & n. 3 (D.C.Cir.) (defense should be limited to physical or extreme psychological abuse of defendant), *cert. denied,* 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247

(1983), and *United States v. Bogart,* 783 F.2d 1428 (9th Cir.) (government conduct must be more than inducement, government must have "created" or "manufactured" the crime solely for the purpose of generating criminal charges), *vacated in part on other grounds sub nom. United States v. Wingender,* 790 F.2d 802 (9th Cir. 1986).

**7.** Judge Easterbrook's analysis of the validity of the "due process" defense concludes:

When push comes to shove, we should reject the contention that the criminal must go free because the constable was too zealous. Why raise false hopes? Why waste litigants' and judges' time searching for and rejecting on the facts defenses that ought not exist as a matter of law? Everyone has better things to do.... "I know it when I see it" is not a rule of any kind, let alone a command of the Due Process Clause.

*Miller,* 891 F.2d at 1272–74.

1991) ("whether investigative conduct violates a defendant's right to due process *cannot* depend on the degree to which the governmental action was responsible for inducing the defendant to break the law") (emphasis added) *with United States v. Gamble,* 737 F.2d 853, 858 (10th Cir.1984) ("defendant may not invoke the Due Process Clause ... *unless* the government's acts, no matter how outrageous, had a role in inducing the defendant to become involved in the crime") (emphasis added).

Moreover, the potential violation of separation of powers inherent in this "defense," coupled with the unavoidable subjectivity to which any purportedly objective assessment of "outrageousness" must devolve, has nowhere been as apparent as in the unseemly power struggle between the court of appeals and the district court in *United States v. Simpson,* 813 F.2d 1462 (9th Cir.1987), *cert. denied,* 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987). There, the Ninth Circuit Court of Appeals reversed the district court's dismissal of the indictment, holding that the government's conduct [8] "was not so outrageous as to justify dismissal of the indictment on due process grounds." *Id.* at 1465. The court remanded for further proceedings "consistent with" its opinion. *Id.* at 1473.

The district court, on remand, promptly dismissed the indictment again, this time as an exercise of its "supervisory powers." The Ninth Circuit again reversed. *United States v. Simpson,* 927 F.2d 1088, 1091 (9th Cir. 1991). The court held that, although the supervisory power may be invoked to deter future illegal activity, such a justification was inapplicable because there had been no violation of the defendant's due process rights and because none of the illegal activities of the informant were done at the request of the government or in furtherance of governmental aims. *Id.* The court also held that, even if the government had broken the law (or, presumably, violated the defendant's due process rights), dismissal under the court's

supervisory power would be an unconstitutional violation of separation of powers. *Id.* The court stated:

> Dismissing an indictment with prejudice encroaches on the prosecutor's charging authority, substituting a judicial wag-of-the-finger for the prosecutorial nod. Such an intrusion will be permitted only in cases of flagrant *prosecutorial* misconduct.... The conduct here was neither fairly attributable to the prosecutor nor sufficiently flagrant to justify dismissal with prejudice.

*Id.* (emphasis added). Thus, the Ninth Circuit's two opinions in *Simpson* show that, when defendants raise the "due process" defense, it is the "wrong" which is illusory and the "remedy" sought which is, in fact, unconstitutional.

### E. Conclusion

In sum, there is no binding Supreme Court authority recognizing a defense based solely upon an objective assessment of the government's conduct in inducing the commission of crimes. Nonbinding dicta of the Court, indicating that there may be such a defense, has been recanted by its author based upon reasoning later adopted by a majority of the Court in *Payner,* 447 U.S. at 737 n. 9, 100 S.Ct. at 2447 n. 9. Moreover, this court has recognized the availability of this defense only in dicta because, in every case in which the issue has been raised, the government's conduct has been held not to have been "outrageous." The only case squarely holding that an objective assessment of the government's conduct in a particular case may bar prosecution *without regard for* the defendant's predisposition has been greatly criticized, often distinguished and, recently, disavowed in its own circuit.

### III. Analysis

Based on the lack of binding precedent from either the Supreme Court or the Sixth Circuit, we are of the view that this panel is not required to recognize the "due process"

---

8. In *Simpson,* the government used a false affidavit to get wire taps, "manipulated" a prostitute who was drug addict and a fugitive from Canadian authorities into becoming an informant, continued using that informant even after learning that she was sleeping with the defendant, and used that informant even though the government knew she was continuing to use heroin and engage in prostitution. *Simpson,* 813 F.2d at 1465.

defense. Moreover, there are three strong reasons for concluding that such a defense simply does not exist: (1) government conduct which induces a defendant to commit a crime, even if labelled "outrageous," does not violate that defendant's constitutional right of due process; (2) the district court lacked authority to dismiss the indictment for governmental misconduct where no violation of an independent constitutional right has been shown; and (3) continued recognition of this "defense" stands as an invitation to violate the constitutional separation of powers, intruding not only on the province of the Executive Branch but the Legislative Branch as well.

### A. Inducement Does Not Violate Due Process

The logical inconsistency underlying the assertion of a "due process" defense is apparent simply in restating the defendants' contention. They argue that it would be "fundamentally unfair" to convict them of a crime, even assuming that they were predisposed to commit that crime, because of the outrageous conduct of the government in inducing their actions. As noted above, however, the Supreme Court has held that the basis for the entrapment defense lies in congressional intent and, specifically, *not* in the Due Process Clause of the Fifth Amendment. *Russell*, 411 U.S. at 430–31, 93 S.Ct. at 1642. From this it must certainly follow that, if Congress were to reject entrapment as a defense, even defendants who were induced to commit a crime and who were *not* predisposed could be convicted without violating due process. If due process is not offended by convicting those who are *not* predisposed, *a priori* it is not offended by convicting those who *are* predisposed.

This is the inconsistency which Justice Rehnquist sought to avoid when, in *Hampton*, he rejected the defendant's "due process" defense and held that claims of inducement, outrageous or otherwise, must be analyzed under the law of entrapment. *Hampton*, 425 U.S. at 490, 96 S.Ct. at 1650. It is also the inconsistency which prompted this court to reject outright the first "due pro-

cess" defense presented to it. *See Leja*, 563 F.2d at 247.

### B. The District Court Has No Authority to Dismiss an Indictment on These Grounds

In *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), the district court set aside the defendant's conviction after ruling that evidence illegally seized from a third party's briefcase could not be admitted against the defendant. *Id.* at 730, 100 S.Ct. at 2443. Acknowledging the "standing" limitations on the Fourth Amendment exclusionary rule, the district court nevertheless excluded the evidence on the grounds of due process and its supervisory powers. *Id.* at 730–31, 100 S.Ct. at 2443–44. This court affirmed on the ground that exclusion was a proper exercise of the court's supervisory powers and did not reach the due process question. *Id.* at 731, 100 S.Ct. at 2444. The Supreme Court reversed.

The Court held that the requirement of "standing" vis-a-vis the Fourth Amendment exclusionary rule represented a balance of competing interests, *i.e.*, the interest of society in convicting criminals and the interest of society in deterring illegal searches. *Id.* at 733, 100 S.Ct. at 2445. This balance, the Court held, was not subject to case-by-case second-guessing by the lower courts in the guise of exercising their "supervisory power." *Id.* at 735–36, 100 S.Ct. at 2446–47.

The Court also held that the defendant could not prevail under a "due process" challenge because,

> even if we assume that the unlawful briefcase search was so outrageous as to offend fundamental " 'cannons of decency and fairness,' " *Rochin v. California*, 342 U.S. 165, 169 [72 S.Ct. 205, 208, 96 L.Ed. 183] (1952), *quoting Malinski v. New York*, 324 U.S. 401, 417 [65 S.Ct. 781, 789, 89 L.Ed. 1029] (1945) (opinion of Frankfurter, J.), the fact remains that "[t]he limitations of the Due Process Clause ... come into play only when the government activity in question violates some protected right of the defendant," *Hampton v. United States, supra*, 425 U.S., at 490 [96 S.Ct., at 1650] (plurality opinion).

*Id.* at 737 n. 9, 100 S.Ct. at 2447 n. 9. This clear statement rejecting any "objective" assessment of the government's conduct, we believe, lays to rest whatever modicum of *Russell*'s dicta may have survived *Hampton.*

As discussed, defendants in the present case have not demonstrated a violation of their due process rights. Moreover, the Supreme Court, by repeated majority decision, has held that the balance between the desire to curb government inducement and the need to convict criminals is drawn at *predisposition,* not "outrageousness." The district court's dismissal in this case flaunts that balance.

### C. "Due Process" Defense Violates Separation of Powers

It is not difficult to label as "outrageous" any conduct of the Executive Branch that "creates" or induces more crime than that with which society must already contend. That is not the issue. The issue has always been: What to do about this conduct and which branch of the government should do it? Clearly, the Executive Branch is *primarily* responsible for, and answerable to the electorate for, its own conduct. In addition, the Executive Branch is constrained by "applicable constitutional and statutory limitations and [by] judicially fashioned rules to enforce those limitations." *Russell,* 411 U.S. at 435, 93 S.Ct. at 1644.

With regard to acts of inducement, the Legislative Branch has implicitly curbed the Executive Branch by intending, as an implied part of each criminal statute, that no conviction may be had against one who was induced by the government to commit a crime unless the government proves, beyond a reasonable doubt, that the defendant was predisposed to commit that crime. *Jacobson v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992). Thus, a defendant's *subjective* predisposition marks the point at which society's interest in preventing governmental overreaching is outweighed by society's interest in punishing those who commit crimes, not the *objective* character of the government's conduct.

This line, established by Congress and articulated by the Supreme Court beginning in *Sorrells,* is not subject to circumvention on a case-by-case basis. The mere invocation of the phrase "due process" does not give the courts license to conduct its own "oversight" of police practices. Where no law has been broken and none of the defendants' constitutional rights have been violated, the court's focus must remain where Congress has directed it, *i.e.,* on the defendants' subjective predisposition.

Finally, because entrapment and predisposition are ordinarily questions for the jury, *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988), the line drawn by Congress and articulated by the Supreme Court ensures that the *jury,* as the traditional "defense against arbitrary law enforcement," *Duncan v. Louisiana,* 391 U.S. 145, 156, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968), operates as the ultimate check on abuses of executive power.

For the reasons just discussed, therefore, we hold that a defendant whose defense sounds in inducement is, by congressional intent and Supreme Court precedent, limited to the defense of entrapment and its key element of predisposition. Defendants may not circumvent this restriction by couching their defense in terms of "due process" or "supervisory powers." Thus, we reject as a matter of law the theory upon which defendants based their motion to dismiss without regard to the particular facts of their case and without reaching the issue of whether or not those facts can properly be characterized as "outrageous."

### IV. Entrapment as a Matter of Law

To ensure that nothing we have said above is taken as having expressed an opinion as to defendants' claim of entrapment, we address that issue now. The defendants' motions to dismiss raise both the "due process" defense and entrapment as a matter of law. To warrant dismissal before trial on the ground that the defendant was entrapped as a matter of law, this court has held that "the undisputed evidence must demonstrate a 'patently clear' absence of predisposition."

*United States v. Harris,* 9 F.3d 493, 498 (6th Cir.1993) (*quoting Barger,* 931 F.2d at 366).

In the present case, although it was not necessary to reach the issue because of the disposition of the "due process" defense, the magistrate judge stated that because of the defendants' "willingness to participate in this scheme, it is not likely that the defendants would be able to mount a successful entrapment defense." (J.A. at 59.) The district court further noted that "but for the finding of the Magistrate [regarding the "due process" defense] and the concurrence of this Court in that finding, it is doubtful that any defense of entrapment would prevent you from being found guilty on those offenses." (J.A. at 172.) The district court concluded, however, that entrapment "is something that a *jury* would have had to determine." *Id.* (emphasis added).

█ We believe the district court and the magistrate judge were correct to conclude that the question of entrapment in this case should be left to the jury. The evidence in the record before us, taken in the light most favorable to the government, is neither "undisputed" nor "patently clear" regarding whether these defendants were predisposed to commit their crimes. Therefore, the question must be resolved by the jury.

## V.

The district court's dismissal of the defendants' indictment is, for the reasons discussed above, **REVERSED** and this case is **REMANDED** for trial.

BOYCE F. MARTIN, JR., Circuit Judge, concurring in the result.

While I agree in principle with much of the majority's analysis, I believe that this panel is bound by prior Sixth Circuit decisions recognizing the existence of an "outrageous government conduct" defense, under the Due Process Clause of the Fifth Amendment, to criminal prosecution. I concur in the result, nevertheless, because the government's conduct in the present case was not outrageous.

As the majority correctly observes, this Circuit has decided more than two dozen cases involving an "outrageous government conduct" defense, rejecting it in each instance on the facts. In *United States v. Barger,* 931 F.2d 359, 363–64 (6th Cir.1991), we reiterated four factors that must be weighed in determining whether governmental conduct is outrageous:

(1) the need for the police conduct as shown by the type of criminal activity involved, (2) the impetus for the scheme or whether the criminal enterprise preexisted the police involvement, (3) the control the government exerted over the criminal enterprise, and (4) the impact of the police activity on the commission of the crime.

In *Barger* and *United States v. Payne,* 962 F.2d 1228, 1231–33 (6th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 306, 121 L.Ed.2d 229, *and cert. denied,* — U.S. —, 113 S.Ct. 811, 121 L.Ed.2d 684 (1992), our most recent published opinions involving this defense, we engaged in a lengthy analysis of each factor under the circumstances of the particular case. This analysis was undertaken, in both instances, in a separate section of the opinion devoted solely to the briefed and argued issue of outrageous government conduct, and not simply in a passing statement or cursory, superfluous commentary. Accordingly, I cannot agree with the majority's characterization of this repeated treatment as *dicta.*[1] It seems clear to me that this

---

1. Black's Law Dictionary defines *dictum* as follows:

The word is generally used as an abbreviated form of *obiter dictum,* "a remark by the way;" that is, an observation or remark made by a judge in pronouncing an opinion upon a cause, concerning some rule, principle, or application of law, or the solution of a question suggested by the case at bar, but not necessarily involved in the case or essential to its determination; any statement of the law enunciated by the court merely by way of illustration, argument, analogy, or suggestion. Statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand are obiter dicta, and lack the force of an adjudication. *Dicta are opinions of a judge which do not embody the resolution or determination of the court, and made without argument, or full consideration of the point, are not the professed deliberate determinations of the judge himself.*

Circuit has recognized outrageous government conduct as a valid due process defense, and, as the majority concedes, the Supreme Court has not clearly held otherwise. My disagreement with the majority opinion on this point notwithstanding, I concur in the remand for trial on the entrapment issue because I believe that the government's conduct in the present case was not outrageous.

Black's Law Dictionary 409 (5th ed.1979) (emphasis added) (internal citation omitted).